```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
GLOBAL CARBON OPPORTUNITY                                    :
(CAYMAN) FUND LTD. et al.,                                   :
                                                             :   24 Civ. 4562 (LGS)
                                            Plaintiffs,      :
                       -against-                             :
                                                             :   OPINION & ORDER
CME GROUP INC., et al.,                                      :
                                                             :
                                            Defendants.     :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

Plaintiffs Global Carbon Opportunity (Cayman) Fund Ltd. (the "GCO Fund"), 1798 Center Master Fund Ltd. (the "Center Fund") and Altana Protective Alpha Strategy Fund SLP (the "Altana Fund") bring this action against Defendants CME Group Inc. ("CMEG") and New York Mercantile Exchange, Inc. ("NYMEX"). Plaintiffs bring various claims alleging that Defendants improperly interpreted and failed to enforce rules contained in the NYMEX Rulebook, adversely affecting certain futures contracts held by Plaintiffs. Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the motion is granted.

I.     BACKGROUND

The following facts are taken from the Complaint and documents it incorporates by reference. *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021). These facts are assumed to be true for purposes of this motion and are construed in the light most favorable to Plaintiffs as the non-moving parties. *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022).

A. **The Parties**

Defendant CMEG operates several financial derivatives exchanges, including NYMEX. NYMEX is a commodity futures exchange that offers various financial instruments, including the Global Emissions Offset Futures Contract (the "GEO Futures Contract" or the "Contract"). Plaintiffs are investment funds that, between November 2022 and May 2023, purchased long positions in the GEO Futures Contract for settlement in December 2024 and the GEO Futures Contract for settlement in December 2025.

B. **Carbon Offset Credits and CORSIA Eligibility**

The GEO Futures Contract provides for delivery of physical carbon offset credits. Carbon offsets, or carbon credits, are intended to reduce greenhouse gases by funding projects that reduce carbon emissions. Similar to traditional commodity futures contracts, carbon credit futures contracts, including the GEO Futures Contract, allow market participants to purchase or sell a physical carbon credit to be delivered at a specific future date for a specific price. Carbon offsets are traded on carbon markets, which are subject to various regulatory regimes.

One such regulatory body, the United Nations' International Civil Aviation Organization ("ICAO"), adopted a resolution to curb the carbon pollution of international flights. This resolution facilitated development of the Carbon Offsetting and Reduction Scheme for International Aviation ("CORSIA"), a global market-based measure to limit the net carbon emissions of flights between participating countries. CORSIA requires airline operators to track and report carbon emissions and then demonstrate that they have met the carbon offsetting requirements for the applicable compliance period or "phase." These comprised the Pilot Phase (2021-2023), the First Phase (2024-2026) and the Second Phase (2027-2035), with each phase expanding the flights subject to the plan's requirements. To meet the carbon offsetting

requirements, airline operators can buy emission units in carbon markets, but ICAO determines which units meet CORSIA requirements for each phase of implementation. ICAO periodically updates lists of which emission units are CORSIA eligible. For each phase, CORSIA-eligible units had to be issued by certain registries, and the underlying emissions reductions had to have occurred during a specified time period, referred to as a "vintage." Pilot Phase units were required to be issued by one of nine registries and have a 2016 to 2020 vintage. These Pilot Phase units were not CORSIA-eligible after December 31, 2023. First Phase units were required to be issued by one of two registries and have a vintage of 2021 through 2026.

    C. **The GEO Futures Contract**

In response to growing carbon markets, NYMEX created the GEO Futures Contract and certified to the Commodity Futures Trading Commission ("CFTC") its initial listing for trading in early 2021. The GEO Futures Contract is governed by Chapter 1269 of the NYMEX Rulebook. Section 1269101 of Chapter 1269 states that the GEO Futures Contract delivers carbon offsets that "meet all GEO Screening Criteria, including CORSIA Eligibility." The GEO Screening Criteria were established by CBL Markets, a spot market operator for carbon credit trading. CORSIA eligibility for the First Phase had not yet been announced when the GEO Futures Contract was launched in 2021.

Section 1269100 of Chapter 1269 of the NYMEX Rulebook defines "GEO Screening Criteria" as the "criteria established under the CBL Standard Instruments Program to identify voluntary emission offset units as eligible for physical delivery under the GEO spot contract listed under Schedule 16 of the CBL Market Operating Rules, found here," with "here" linking to a copy of the CBL Market Operating Rules (version 3.3) containing Schedule 16. Schedule

16, in turn, defines "CBL GEO Standards Instruments Program" as the CBL program in which each qualifying unit:

> (i) is duly registered at an Approved Registry; and (ii) meets eligibility criteria consistent with that published by [ICAO] as and referenced in Annex 16 -- Environmental Protection, Volume IV -- [CORSIA], *as such criteria may be updated from time to time*, including but not limited to project type, and project commencement date. [Emphasis added.]

The First Phase eligibility criteria were announced in March 2023. Because NYMEX never certified a post-March 2023 amendment to Chapter 1269, the GEO Screening Criteria remained substantively unchanged until the publication of NYMEX's Special Executive Report 9197 ("SER 9197") in May 2023.

### D. The Rule Change and Alleged Misconduct

In April and early May 2023, Plaintiffs and representatives of Defendant CMEG discussed Plaintiffs' open positions in the GEO Futures Contract. During these discussions, the Director of Energy and Environmental Products for Defendant CMEG informed Plaintiffs that Defendants intended to conduct a market consultation survey regarding the standards for delivery of the GEO Futures Contract. Around this time, Defendants were aware of disagreement among market participants on either side of a trade regarding the correct interpretation of Chapter 1269 of the NYMEX Rulebook and which CORSIA criteria would apply. The Complaint alleges that Defendants never undertook the referenced market consultation survey, and, while also engaged in discussions with Plaintiffs, Defendant CMEG allegedly represented to other market participants that the deliverables for the GEO Futures Contracts would be CORSIA-eligible emissions units for the Pilot Phase.

On May 11, 2023, Defendants published SER 9197, stating that the emissions units for physical delivery to settle the GEO Futures Contract, including the contracts owned by Plaintiffs,

were the CORSIA-eligible emissions units for the Pilot Phase (2021-2023) and not CORSIA-eligible emissions units for the First Phase (2024-2026).  On December 4, 2023, Defendant NYMEX certified to the CFTC an amendment of the GEO Futures Contract that explicitly restricted the deliverable units to Pilot Phase emission units.

Construing the pleadings in Plaintiffs' favor, SER 9197 marked a material change: it allowed delivery of Pilot-Phase credits (vintages 2016-2020) even though, once ICAO's First Phase began on January 1, 2024, those credits would no longer be CORSIA-eligible and thus could not be used by airlines to satisfy CORSIA obligations.  Plaintiffs allege that First-Phase credits would command greater demand and higher prices, so that re-freezing the vintage window at 2016-2020 diminished the market value of credits that long holders would receive in December 2024 and December 2025, thereby devaluing their GEO futures positions.  Defendants posit that the notice made no change at all, maintaining that the GEO contract has always required units that "meet all GEO Screening Criteria, including CORSIA Eligibility" as of the contract's launch date, not the delivery date.  SER 9197 expressly states that "the criteria for physical-delivery eligibility are unchanged from prior to this notice," and the contemporaneous NYMEX rule-certification filing repeats the same position.  Ultimately, on the merits, the claims in this case boil down to whether SER 9197 altered, or merely clarified, the contract's delivery specification, and what effect that interpretation had on the value of Plaintiffs' long positions.

The price of the GEO Futures Contract decreased significantly from the time of Plaintiffs' purchases to the time when Plaintiffs sold their interests.  Plaintiffs collectively allege tens of millions of dollars in lost profits and additional damages from related commissions and brokerage fees.

## II.  DISCUSSION

The Complaint asserts four causes of action: (1) violation of the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 25, against Defendant NYMEX, (2) promissory estoppel against Defendant CMEG, (3) breach of contract against Defendant NYMEX and (4) tortious interference with contract against Defendant CMEG.  They are discussed in turn below.

### A.  The CEA Claim

Defendants' motion to dismiss the CEA claim for failure to state a claim is granted.

#### 1.  Legal Standard - Dismissal for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021).[1]  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ] . . . claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  Under Rule 12(b)(6), a court "accept[s] as true all well-pleaded factual allegations, draw all reasonable inferences in the plaintiff's favor, and assess the complaint to determine whether those allegations plausibly establish entitlement to relief." *Tripathy v. McKoy*, 103 F.4th 106, 113 (2d Cir. 2024).  A court does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

### 2. Failure to State a Claim

The Complaint does not state a "failure to enforce" claim under the CEA. The allegations regarding Defendant NYMEX's rule interpretation do not fit within the statutory parameters of such a claim. "CEA § 22 enumerates the only circumstances under which a private litigant may assert a private right of action for violations of the CEA." *Klein & Co. Futures v. Bd. of Trade of City of New York*, 464 F.3d 255, 259 (2d Cir. 2006); *accord Kumaran v. Nat'l Futures Ass'n, LLC*, No. 20 Civ. 3668, 2022 WL 1805936, at *2 (S.D.N.Y. June 2, 2022). As relevant to Plaintiffs' claim, § 22(b) states: "A registered entity that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce . . . , or . . . any registered entity that in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation, or order, shall be liable for actual damages sustained" due to the failure to enforce the rule at issue. 7 U.S.C. § 25(b)(1) (codifying what is referred to as § 22). A plaintiff alleging a violation must establish that the registered entity "acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss." *Id.* at § 25(b)(4).

The core facts are undisputed, though the parties characterize them differently. Plaintiffs allege NYMEX changed the GEO contract by issuing SER 9197 and then certifying an amendment that limited deliverable units to Pilot-Phase vintages (2016-2020). Before SER 9197, the contract and CME marketing materials stated that "[f]irms taking delivery will receive an offset credit from a registry and project that meets the CORSIA criteria." The marketing materials also stated that:

> Emission offset futures from CME Group allow for the selling and buying of carbon credits issued in specific vintage years. The vintage years vary based on the specific contract. For GEO, vintage years are linked to the CORSIA

7

> framework. Any change in the vintage eligibility is determined by the changes in this standard.

Plaintiffs understood this to mean that First-Phase-eligible vintages were required for the December 2024 and December 2025 Contracts. After SER 9197, only Pilot-Phase units could settle those contracts, leaving long positions (Plaintiffs' side of the trades) holding credits no airline could use for CORSIA compliance and therefore worth less.

Defendants reject Plaintiffs' framing and instead allege that SER 9197 and the amendment merely clarified an ambiguity in Chapter 1269 -- namely, what it means to "meet all GEO Screening Criteria, including CORSIA Eligibility." Regardless of characterization -- unilateral amendment or permissible clarification -- the Complaint does not allege a "failure to enforce a rule" within the narrow private right of action Congress created in 7 U.S.C. § 25(b). Section 25(b) permits a trader to sue only when a registered entity refuses to police third-party misconduct under an existing rule. Here, Plaintiffs challenge NYMEX's own rule-interpretation (or rulemaking) decision, a type of dispute Congress consigned to exchange oversight and CFTC review, not to private litigation. Because Plaintiffs' grievance is, at most, an alleged rule change or misinterpretation, Count I falls outside § 25(b) and is dismissed.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs contend that because the NYMEX interpretation results in the delivered units being CORSIA ineligible, it is so arbitrary and irrational that it amounts to a failure to enforce the rule. But Plaintiffs offer no authority that transforms an allegedly "arbitrary and irrational" change to an exchange rule into a "failure to enforce" the prior version of that rule. Accepting that theory would expand the statute's scope well beyond the narrow class of private actions Congress allowed -- those aimed at an exchange's refusal to police market participants under rules already in force. Whether NYMEX's interpretation was wise, unwise or even improper is beside the point; Congress

8

entrusted questions of rule interpretation and amendment to the exchange and the CFTC, not to private litigants or the courts. *See* H.R. Rep. No. 97-565, Part 1, at 55 (1982) ("The Committee fully expects that [the CFTC and self-regulatory agencies] will vigorously use the tools at its command to protect the investing public so that it does not become necessary to rely on private litigants as a policeman of the Commodity Exchange Act."). Because Plaintiffs' allegations challenge a purported rule change rather than a failure to apply an existing rule, Count I falls outside the narrow circumstances under which a private litigant may assert a private right of action for violations of the CEA.

Even if the statute could be stretched to reach rule-interpretation disputes, Plaintiffs still fail to allege that NYMEX's construction was "so unreasonable as to be irrational." Defendant NYMEX has "reasonable discretion" in complying with core principles of the CEA, including in establishing and enforcing rules for the contract market, and the interpretation here falls within that discretion. *See* 7 U.S.C. § 7(d)(1)(B); *U.S. Commodity Futures Trading Comm'n v. Byrnes*, 58 F. Supp. 3d 319, 325 (S.D.N.Y. 2014) (describing NYMEX's discretion in policing its market and market participants). The interpretation clarified -- in a way consistent with the CBL Market Operating Rules referenced in the contract -- that the relevant CBL Standards Instrument Program included a vintage requirement that means eligible units must have vintages of 2016 to 2020. The result of this interpretation is that the units delivered are eligible for the CORSIA Pilot Phase and not the CORSIA First Phase, although the Pilot Phase would no longer be in effect after 2023, when the contracts purchased by Plaintiffs would settle. There is tension between the requirements of the CBL Standards Instrument Program and the evolving CORSIA eligibility criteria as to units delivered after 2023, but Defendant NYMEX's attempt to resolve that tension is not so irrational as to repudiate the terms of the Contract.

For the reasons discussed above, the CEA claim is dismissed.  As the Complaint fails to allege a failure to enforce claim, this Opinion does not address the issue of whether the Complaint adequately alleges bad faith.

**B. Remaining State Law Claims**

The remaining causes of action assert claims that arise under state common law.  Count II alleges promissory estoppel against CMEG.  Count III alleges breach of contract against NYMEX.  And Count IV alleges tortious interference with contract against CMEG.  These claims are dismissed as Plaintiffs do not adequately plead diversity of citizenship sufficient to support federal subject matter jurisdiction, and the Court declines to exercise supplemental jurisdiction.

    **1. Diversity Jurisdiction**

In the absence of a federal claim, the parties' diversity of citizenship may provide an alternate basis for federal subject matter jurisdiction.  Federal courts have jurisdiction over disputes between "citizens of different States" when the matter in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1).  Diversity jurisdiction requires "complete diversity of citizenship between every plaintiff and every defendant."  *Windward Bora LLC v. Browne*, 110 F.4th 120, 125-26 (2d Cir. 2024).  "A corporation shall be deemed to be a citizen of . . . the State or foreign state where it has its principal place of business."  § 1332(c)(1).  "The citizenship of a limited liability company is determined by the citizenship of each of its members."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016); *accord Gianetti v. Teakwood, Ltd.*, No. 21-782-CV, 2022 WL 815793, at *1 (2d Cir. Mar. 18, 2022) (summary order).

Here, Plaintiffs do not carry their burden of proving complete diversity.  *See Windward Bora*, 110 F.4th at 125-26 ("[Diversity jurisdiction requires] complete diversity of citizenship

10

between every plaintiff and every defendant."). The Complaint does not properly plead the citizenship of the Altana Fund, which is a limited liability company. In response to the Court's inquiry, Plaintiffs have responded that the fund is a citizen of New York among other places. Defendant NYMEX has its principal place of business in New York, New York -- and is therefore also a New York citizen. Without complete diversity, the Court lacks subject matter jurisdiction.

### 2. Supplemental Jurisdiction

Federal district courts may adjudicate state law claims based on supplemental jurisdiction when the complaint reasonably alleges a viable federal claim within the district court's original jurisdiction. 28 U.S.C. § 1367(a). Whether to exercise supplemental jurisdiction after dismissing the federal claims is a matter within the district court's discretion, *see Cangemi v. United States*, 13 F.4th 115, 135 (2d Cir. 2021), even in cases that raise defenses based on federal law, *see Klein & Co. Futures*, 464 F.3d at 263 ("Because the decision to retain jurisdiction is discretionary and not a litigant's right, a court is not required either to accept or decline supplemental jurisdiction when a state law claim raises federal preemption issues.").

Here, the Court declines to exercise supplemental jurisdiction. The Second Circuit has explained that "the default rule is that federal courts should not decide related state-law claims unless there is good reason for doing so." *Cangemi*, 13 F.4th at 135; *accord Maxius v. Mount Sinai Health Sys. Inc.*, No. 21 Civ. 10422, 2024 WL 4166157, at *9 (S.D.N.Y. Sept. 12, 2024). Such reasons may include a "court's long history with th[e] case and familiarity with the issues." *Cangemi*, 13 F.4th at 135. At this early stage of litigation, declining to exercise supplemental jurisdiction over the remaining state law claims is appropriate.

### III.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. The CEA claim is dismissed with prejudice, and the state law claims are dismissed without prejudice to refiling in state court.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 28, and to close the case.

Dated: July 17, 2025
       New York, New York

                                        _____
                                        LORNA G. SCHOFIELD
                                        UNITED STATES DISTRICT JUDGE